UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN DOE, | ) | CIV-F-08-0118 AWI SKO |
| Plaintiff, | ) | |
| | ) | ORDER RE: MOTIONS FOR |
| v. | ) | SUMMARY JUDGMENT |
| | ) | |
| KAWEAH DELTA HOSPITAL, | ) | |
| KAWEAH DELTA HEALTH CARE | ) | |
| DISTRICT, JULIE BRESEMAN | ) | |
| INDIVIDUALLY AND AS A SOCIAL | ) | |
| WORKER WITH KAWEAH DELTA | ) | Docs. 61 and 63 |
| AND DOES 1 through 20, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Defendants have made motions for summary judgment, arguing Plaintiff has failed to provide sufficient evidence to support his claims and that the claims are barred by the statute of limitations.  The court concludes that Plaintiff's claims are time barred.  In connection with these motions, Plaintiff also seeks to reopen discovery and have defense attorney Jeffery Nelson sanctioned.  As summary judgment is being granted to Defendants, discovery would be pointless at this stage.  The actions of Mr. Nelson do not rise to the level of sanctionable conduct.

**I. History**[1]

Plaintiff John Doe ("Doe") is HIV positive. He was first diagnosed when he was treated for pneumonia at Defendant Kaweah Delta Hospital ("Kaweah Delta") in 2002. Kaweah Delta is operated by the Kaweah Delta Health Care District, which is a political subdivision of the State of California. While hospitalized in 2002, Doe came into contact with an acquaintance, Defendant Julie Breseman ("Breseman"), who was employed by Kaweah Delta. Breseman became Doe's discharge planner. After his hospital stay, Doe kept his HIV positive status to himself; he did not reveal it to his friends or associates. However, Breseman revealed Doe's HIV status to multiple third parties. At the time, Doe owned a hair salon in Visalia. His business began declining in 2005 and fell apart by 2006. Doe believes that is due to Breseman's actions.

Doe filed a California Tort Claims Act ("CTCA") notice of intention to bring suit against Kaweah Delta on October 10, 2007, alleging that Breseman unlawfully revealed Doe's HIV status. Kaweah Delta rejected Doe's CTCA claim. Doe sought and was granted permission from the Eastern District to file under a fictitious name. Doe formally filed suit on January 24, 2008, alleging a 42 U.S.C. §1983 violation for "fail[ure] to adequately train and supervise Julie Breseman and other employees...regarding safeguarding medical privacy....Defendants also failed to take appropriate steps to ensure that the privacy rights of its patients were protected" against Kaweah Delta and causes of action under 42 U.S.C. §1983; Cal. Const., Art. 1, Section 1; Cal. Civ. Code §§56.10 and 56.31; invasion of privacy; negligence; intentional infliction of emotional distress; and negligent infliction of emotional distress against Breseman. Doc. 8, Complaint.

Doe was originally represented by Arturo Gonzalez and Minn Chung of the law firm Morrison and Foerster. They made a motion to withdraw on May 6, 2009. Doc. 35. Magistrate Judge Dennis Beck relieved counsel on May 12, 2009, specifically stating that Doe was proceeding pro se. Doc. 40. Doe made a motion to have Mr. Gonzalez and Mr. Chung reinstated as counsel on December 9, 2009. Doc. 47. Magistrate Judge Gary Austin denied the request

---

[1]The factual history is provided for background only and does not form the basis of the court's decision; the parties' assertions contained therein are not necessarily taken as adjudged to be true. The legally relevant facts relied upon by the court are discussed within the analysis.

1 | December 16, 2009. Doc. 50.

2 |      Kaweah Delta filed a motion for summary judgment on April 26, 2010, with a hearing set

3 | for June 7, 2010.  Breseman filed a motion for summary judgment motion on June 4, 2010.  At

4 | the hearing on June 7, 2010, Doe requested additional time to seek legal representation in this

5 | case; a status conference was set for July 6, 2010.  At that hearing, Doe provided a letter from

6 | attorney James Holland in which he expressed interest in representing Doe assuming the trial

7 | date could be continued.  A further status conference was set for July 26, 2010 to allow Mr.

8 | Holland to formally substitute into the case.  The court made clear to Doe that while the trial date

9 | could be continued, discovery was closed and would not likely be reopened.  At the July 26,

10 | 2010 hearing, Doe informed the court that he needed more time to seek counsel; another status

11 | conference was set for September 13, 2010.  At that hearing, Doe again requested more time.

12 | The court informed Doe that a fifth and final hearing to allow him time to acquire counsel would

13 | be scheduled for October 12, 2010.  At that hearing, Doe did not have new representation, and a

14 | new briefing schedule for the summary judgment motions was set.  Doe did alert the court that

15 | Jeffery Nelson, attorney for Kaweah Delta, had spoken with Mr. Holland to discourage him from

16 | taking Doe's case.  These matters were taken under submission without oral argument after

17 | opposition and replies were filed.

19 | **II. Legal Standards**

20 |      Summary judgment is appropriate when it is demonstrated that there exists no genuine

21 | issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

22 | Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

23 | American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

24 | judgment bears the initial burden of informing the court of the basis for its motion and of

25 | identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an

26 | absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

27 | Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

28 | might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby,

1  Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

2  Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a material fact if there is

3  sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson

4  v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d

5  1178, 1185 (9th Cir. 2006).

6       Where the moving party will have the burden of proof on an issue at trial, the movant

7  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

8  movant. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Where the non-

9  moving party will have the burden of proof on an issue at trial, the movant may prevail by

10  presenting evidence that negates an essential element of the non-moving party's claim or by

11  merely pointing out that there is an absence of evidence to support an essential element of the

12  non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir.

13  2008). If a moving party fails to carry its burden of production, then "the non-moving party has

14  no obligation to produce anything, even if the non-moving party would have the ultimate burden

15  of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

16  Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing

17  party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec.

18  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party cannot "'rest

19  upon the mere allegations or denials of [its] pleading' but must instead produce evidence that

20  'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v.

21  Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

22       The evidence of the opposing party is to be believed, and all reasonable inferences that

23  may be drawn from the facts placed before the court must be drawn in favor of the opposing

24  party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad,

25  Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air,

26  and it is the opposing party's obligation to produce a factual predicate from which the inference

27  may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006);

28  UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of

1   material fact does not spring into being simply because a litigant claims that one exists or

2   promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

3   15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

4   Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

5   "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or

6   'is not significantly probative.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986);

7   Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has

8   the discretion in appropriate circumstances to consider materials that are not properly brought to

9   its attention, but the court is not required to examine the entire file for evidence establishing a

10  genuine issue of material fact where the evidence is not set forth in the opposing papers with

11  adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir.

12  2003).  If the non-moving party fails to produce evidence sufficient to create a genuine issue of

13  material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine Ins.

14  Co. v. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000).

15

16                          **III. Statements of Facts**

17  **A. Kaweah Delta's Statement of Facts (Doc. 61, Part 3)**

18  1. Julie Breseman was employed as a discharge planner and utilization reviewer at Kaweah Delta
19  District Hospital from June 18, 2001, until October 29, 2004.

20  2. As part of her orientation, Julie Breseman signed a document titled Declaration of
    Confidentiality on June 12, 2001.

21  3. Julie Breseman read the Declaration of Confidentiality before signing it.

22  4. Julie Breseman understood the contents of the Declaration of Confidentiality.

23  5. Julie Breseman did not ask questions concerning the Declaration of Confidentiality because
    she thought it was self-explanatory.
24
    6. The Declaration of confidentiality read and signed by Julie Breseman on June 12, 2001 states,
25  among other things, that Ms. Breseman will maintain "the greatest confidentiality in all matters
    pertaining to the District's (hospital) business," including but not limited to "the medical or
26  personal history of all persons." Furthermore, Ms. Breseman understood that a breach of such
    confidentiality would "justify the District in terminating (her) employment and/or relationship
27  with District (hospital)."

28  7. Kaweah Delta Health Care District trained and instructed Julie Breseman to maintain the

**5**

1   greatest confidentiality of patients' medical and personal histories.

2   8. Plaintiff alleges Julie Breseman unlawfully disclosed plaintiff's private medical information to
    Rosemary Whitendale, Trina Davis, and Suzanne Arias.

3   9. Julie Breseman first told Rosemary Whitendale about plaintiff's medical condition in
4   September 2006.

5   10. Julie Breseman first told Trina Davis about plaintiff's medical condition in 2006.

6   11. Julie Breseman first told Suzanne Arias about plaintiff's medical condition in the fall of
    2005.
7
    12. The first disclosure of plaintiff's medical condition by Julie Breseman to Rosemary
8   Whitendale, Trina Davis Edgley, and Suzanne Arias all occurred after Ms. Breseman's
    employment with the District terminated on October 29, 2004.
9

10  **B. Breseman's Statement of Facts (Doc. 67)**

11  **1. First Cause of Action, 42 U.S.C. §1983**

12  1. On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth
    Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California
13  Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy;
    Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional
14  Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health
    Care District, and Julie Breseman.
15
    2. Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a
16  division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge
    planner.
17
    3. Ms. Breseman does not have any special medical training and has never held any professional
18  license or certification.

19  4. On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1,
20  2002.

    5. Ms. Breseman was assigned to Plaintiff as his discharge planner.
21
    6. Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge
22  planner was responding to her question regarding whether he needed oxygen.

23  7. Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical
    condition," but was only able to provide information regarding three alleged witnesses:  Suzanne
24  Arias, Rose Mary Whitendale, and Trina Davis.

25  8. Plaintiff also claims that other people he cannot identify were told, but cannot identify any of
    these alleged persons and has not provided them as witnesses.
26
    9. In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged
27  sharing of his medical condition.

28  10. According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical

condition with Ms. Whitendale before the end of 2002.

11. Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12. Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13. By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's statement about Plaintiff's medical condition.

14. Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15. On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16. In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17. By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their one meeting in the summer of 2004.

18. In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19. Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20. Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

21. Plaintiff saw evidence of a downturn in his business in 2005.

22. Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms. Davis informs him of Ms. Breseman's insinuations.

23. There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical condition after fall 2005.

**2. Second Cause of Action, California Constitution, Article I, Section 1**

1. On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy; Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health Care District, and Julie Breseman.

2.      Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge planner.

7

3.  Ms. Breseman does not have any special medical training and has never held any professional license or certification.

4.  On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1, 2002.

5.  Ms. Breseman was assigned to Plaintiff as his discharge planner.

6.  Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge planner was responding to her question regarding whether he needed oxygen.

7.  Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical condition," but was only able to provide information regarding three alleged witnesses:  Suzanne Arias, Rose Mary Whitendale, and Trina Davis.

8.  Plaintiff also claims that other people he cannot identify were told, but cannot identify any of these alleged persons and has not provided them as witnesses.

9.  In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged sharing of his medical condition.

10.  According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical condition with Ms. Whitendale before the end of 2002.

11.  Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12.  Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13.  By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's statement about Plaintiff's medical condition.

14.  Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15.  On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16.  In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17.  By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their one meeting in the summer of 2004.

18.  In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19.  Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20.  Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

21.  Plaintiff saw evidence of a downturn in his business in 2005.

22.  Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms. Davis informs him of Ms. Breseman's insinuations.

23.  There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical condition after fall 2005.

**3. Third Cause of Action, California Civil Code §§56.10 and 56.31**

1.  On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy; Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health Care District, and Julie Breseman.

2.       Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge planner.

3.  Ms. Breseman does not have any special medical training and has never held any professional license or certification.

4.  On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1, 2002.

5.  Ms. Breseman was assigned to Plaintiff as his discharge planner.

6.  Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge planner was responding to her question regarding whether he needed oxygen.

7.  Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical condition," but was only able to provide information regarding three alleged witnesses:  Suzanne Arias, Rose Mary Whitendale, and Trina Davis.

8.  Plaintiff also claims that other people he cannot identify were told, but cannot identify any of these alleged persons and has not provided them as witnesses.

9.  In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged sharing of his medical condition.

10.  According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical condition with Ms. Whitendale before the end of 2002.

11.  Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12.  Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13.  By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's

statement about Plaintiff's medical condition.

14. Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15. On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16. In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17. By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their one meeting in the summer of 2004.

18. In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19. Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20. Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

21. Plaintiff saw evidence of a downturn in his business in 2005.

22. Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms. Davis informs him of Ms. Breseman's insinuations.

23. There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical condition after fall 2005.

**4. Fourth Cause of Action, Common Law Invasion of Privacy/Disclosure of Private Facts**

1. On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy; Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health Care District, and Julie Breseman.

2.      Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge planner.

3. Ms. Breseman does not have any special medical training and has never held any professional license or certification.

4. On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1, 2002.

5. Ms. Breseman was assigned to Plaintiff as his discharge planner.

6. Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge planner was responding to her question regarding whether he needed oxygen.

7.  Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical condition," but was only able to provide information regarding three alleged witnesses:  Suzanne Arias, Rose Mary Whitendale, and Trina Davis.

8.  Plaintiff also claims that other people he cannot identify were told, but cannot identify any of these alleged persons and has not provided them as witnesses.

9.  In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged sharing of his medical condition.

10.  According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical condition with Ms. Whitendale before the end of 2002.

11.  Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12.  Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13.  By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's statement about Plaintiff's medical condition.

14.  Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15.  On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16.  In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17.  By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their one meeting in the summer of 2004.

18.  In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19.  Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20.  Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

21.  Plaintiff saw evidence of a downturn in his business in 2005.

22.  Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms. Davis informs him of Ms. Breseman's insinuations.

23.  There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical condition after fall 2005.

**5. Fifth Cause of Action, Negligence**

1. On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy; Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health Care District, and Julie Breseman.

2.     Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge planner.

3. Ms. Breseman does not have any special medical training and has never held any professional license or certification.

4. On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1, 2002.

5. Ms. Breseman was assigned to Plaintiff as his discharge planner.

6. Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge planner was responding to her question regarding whether he needed oxygen.

7. Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical condition," but was only able to provide information regarding three alleged witnesses:  Suzanne Arias, Rose Mary Whitendale, and Trina Davis.

8. Plaintiff also claims that other people he cannot identify were told, but cannot identify any of these alleged persons and has not provided them as witnesses.

9. In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged sharing of his medical condition.

10. According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical condition with Ms. Whitendale before the end of 2002.

11. Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12. Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13. By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's statement about Plaintiff's medical condition.

14. Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15. On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16. In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17. By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their

one meeting in the summer of 2004.

18.  In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19.  Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20.  Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

21.  Plaintiff saw evidence of a downturn in his business in 2005.

22.  Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms. Davis informs him of Ms. Breseman's insinuations.

23.  There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical condition after fall 2005.

**6. Sixth Cause of Action, Intentional Infliction of Emotional Distress**

1.  On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy; Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health Care District, and Julie Breseman.

2.      Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge planner.

3.  Ms. Breseman does not have any special medical training and has never held any professional license or certification.

4.  On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1, 2002.

5.  Ms. Breseman was assigned to Plaintiff as his discharge planner.

6.  Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge planner was responding to her question regarding whether he needed oxygen.

7.  Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical condition," but was only able to provide information regarding three alleged witnesses:  Suzanne Arias, Rose Mary Whitendale, and Trina Davis.

8.  Plaintiff also claims that other people he cannot identify were told, but cannot identify any of these alleged persons and has not provided them as witnesses.

9.  In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged sharing of his medical condition.

10.  According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical

13

condition with Ms. Whitendale before the end of 2002.

11.  Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12.  Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13.  By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's statement about Plaintiff's medical condition.

14.  Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15.  On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16.  In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17.  By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their one meeting in the summer of 2004.

18.  In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19.  Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20.  Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

21.  Plaintiff saw evidence of a downturn in his business in 2005.

22.  Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms. Davis informs him of Ms. Breseman's insinuations.

23.  There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical condition after fall 2005.

**7. Seventh Cause of Action, Negligent Infliction of Emotional Distress**

1.  On January 24, 2008, Plaintiff filed his "Complaint for Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Violation of California Constitution; Violation of California Civil Code §§ 56.10 and 56.31; Invasion of Privacy; Negligence; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress" ("Complaint") against named defendants Kaweah Delta Hospital, Kaweah Delta Health Care District, and Julie Breseman.

2.       Julie Breseman was hired by Kaweah Delta District Hospital ("the Hospital") which is a division of Defendant Kaweah Delta Health Care District on June 18, 2001 as a discharge planner.

3.  Ms. Breseman does not have any special medical training and has never held any professional license or certification.

4.  On March 22, 2002, Plaintiff was admitted to the Hospital; he was discharged on April 1, 2002.

5.  Ms. Breseman was assigned to Plaintiff as his discharge planner.

6.  Plaintiff admits that the only involvement he had with Ms. Breseman in her role as discharge planner was responding to her question regarding whether he needed oxygen.

7.  Following his discharge, Plaintiff claims that Ms. Breseman told people about his "medical condition," but was only able to provide information regarding three alleged witnesses:  Suzanne Arias, Rose Mary Whitendale, and Trina Davis.

8.  Plaintiff also claims that other people he cannot identify were told, but cannot identify any of these alleged persons and has not provided them as witnesses.

9.  In 2005, Plaintiff claims that he saw a decline in his business which he attributes to the alleged sharing of his medical condition.

10.  According to Suzanne Arias, she heard Ms. Breseman discussing Plaintiff's medical condition with Ms. Whitendale before the end of 2002.

11.  Ms. Arias also noted that Plaintiff's business began to drop off within months of his discharge from the Hospital.

12.  Sometime during July to September 2004, Trina Davis and Rose Marie Whitendale testified that they were informed of Plaintiff's medical condition by Ms. Breseman, but Ms. Davis admits that she inferred his condition and was not told directly.

13.  By September 2004, Ms. Whitendale begins hinting to Plaintiff regarding Ms. Breseman's statement about Plaintiff's medical condition.

14.  Although Plaintiff admits that he understood Ms. Whitendale's hints, he chose to ignore them.

15.  On October 29, 2004, Ms. Breseman ended her employment with the Hospital.

16.  In early 2005, Ms. Whitendale claims that she overheard Ms. Breseman telling strangers about Plaintiff's medical condition in bars in Fresno and noted a downturn in Plaintiff's Visalia business.

17.  By the summer of 2005, Trina Davis tells Plaintiff of Ms. Breseman's statements from their one meeting in the summer of 2004.

18.  In the summer/fall of 2005, Ms. Arias claims she heard Ms. Breseman telling an unknown person in the bathroom at Ewell's Bar in Fresno.

19.  Plaintiff admits that Ms. Arias told him what she had overheard immediately following her return from the bathroom at Ewell's.

20.  Plaintiff believed upon hearing about Ms. Breseman's statements at Ewell's that they would hurt his business and that the hints that Ms. Whitendale started giving him in 2004 were true.

1    21.  Plaintiff saw evidence of a downturn in his business in 2005.

2    22.  Plaintiff was informed of Ms. Breseman's 2004 and 2005 statements again in fall 2006 when
3    Ms. Whitendale spoke to him directly about it, Ms. Arias tells him for a second time, and Ms.
     Davis informs him of Ms. Breseman's insinuations.

4    23.  There is no evidence that Ms. Breseman made any statements regarding Plaintiff's medical
5    condition after fall 2005.

6                                        **IV. Discussion**

7    **A. Statute of Limitations**

8            Doe has made inconsistent statements concerning when he first learned Breseman

9    revealed his HIV status to third parties.  In the complaint, he states "In 2006, John learned from

10   one of his clients that, since some time in 2004, Ms. Breseman had been telling many of his

11   clients that John had 'full blown' AIDS and that they should avoid going to his hair salon." Doc.

12   8, Complaint, at 2:15-17.  The CTCA notice included the assertion that Doe "discovered the

13   unlawful disclosure in the Fall of 2006." Doc. 84, Exhibit B.  In the briefing on these motions

14   though, Doe states "I agree that by the end of 2005, that I knew the statements had been made

15   and damage had been done." Doc. 84, Doe Opposition, at 2:28:3:1.

16           Breseman argues that Doe was informed by Rose Whitendale (a third party) at an earlier

17   date: "Plaintiff had received hints that Ms. Breseman had made statements about his medical

18   condition by September 2004 and chose to ignore them." Doc. 86, Breseman Reply, at 4:12-13.

19   In response to Breseman's motion for summary judgment, Kaweah Delta joined in asserting that

20   Doe's claims are barred by the statute of limitations. See Doc. 62, Kaweah Delta Supplemental

21   Brief.  Doe's own deposition makes clear that he learned from Ms. Whitendale in 2004 that

22   Breseman had revealed his HIV status:

23           A. Because Rosemary Whitendale - you have her deposition. She is one of the witness -
             in 2004 knew that Julie had been telling people when she was an employee of the hospital
24           in 2004, but she didn't tell me until later on.

25           Q. When did she tell you?

26           A. Well, she tried to hint it around to me, but I would just say, 'Oh, I don't even know
             what you are talking about.'
27
             Q. Ms. Whitendale?
28

1    A. Yeah.

2    Q. When did she start hinting around to you?

3    A. In '04.

4    ....

5    Q. Right. But it was on the way from Ewell's to Denny's in '04 that you and Rose had this conversation?

6
7    A. Well, we've had it several times before, but, like I said, I always didn't want to acknowledge it.

8    Q. Okay. So the fact that -

9    A. She was still an employee at the hospital at the time in 2004. 'Cause this happened between January, February, March, somewhere in there, right here.

10
11   Q. And you're sure it was 2004 that you were - that this that you are telling me about occurred?

12   A. It was January - I don't know the specific - the date, all I know it was in one of those months.

13
     Q. In 2004?

14
     A. In 2004, because she was still working there because Rose was babysitting her son.

15
16   Q. Okay. So, again, on the way from Ewell's to Denny's in 2004, with Julie passed out in the backseat, and a man with her passed out in the backseat, Rose attempted to engage you in conversation relative to Julie?

17
18   A. She was asking me if it was true, and I said, 'Oh stop it. Get out.' And I get out of the car, and I said, 'Come on, let's have breakfast.' So it wasn't never brought up again.

19   ....

20   Q. And Rose Whitendale says to you at that time that Julie has said, 'You have full-blown AIDS.' And you hear that and you change the subject immediately.

21
22   A. Immediately. I opened the door and I said, 'Come on, let's have breakfast.' Because I didn't want to believe it.

23   Q. Okay.

24   A. But it's true. She did say that.

25   Q. And even before that time in the car in the Denny's parking lot, Rose Whitendale tried to bring it up before and you would change the subject before, as well?

26
27   A. Right.

28   Doe Deposition, at 222:9-20; 227:24-229:1; and 230:14-25.  The exchange demonstrates that

**17**

1    Doe knew of Breseman's disclosure in 2004. The fact that Doe did not want to deal with the

2    situation at the time he was informed does not change the analysis for statute of limitations

3    calculation.

4         "[A] a cause of action does not accrue until the plaintiff either discovers the injury and its

5    negligent cause or could have discovered the injury and cause through the exercise of reasonable

6    diligence. The statute of limitations begins to run when the plaintiff suspects or should suspect

7    that his or her injury was caused by wrongdoing - when the plaintiff has notice of information or

8    circumstances that would put a reasonable person on inquiry." San Francisco Unified School

9    Dist. v. W.R. Grace & Co., 37 Cal. App. 4th 1318, 1326 (Cal. App. 1st Dist. 1995), citations

10   omitted. Under California law, the default statute of limitations for personal injury is, "Within

11   two years: An action for assault, battery, or injury to, or for the death of, an individual caused by

12   the wrongful act or neglect of another." Cal. Code Civ. Proc. §335.1. "[C]laims brought under

13   §1983 borrow the forum state's statute of limitations for personal injury claims, and in

14   California, that limitations period is two years. See Cal. Code Civ. Proc. § 335.1. Generally, the

15   statute of limitations begins to run when a potential plaintiff knows or has reason to know of the

16   asserted injury." Action Apt. Ass'n v. Santa Monica Rent Control Opinion Bd., 509 F.3d 1020,

17   1026-27 (9th Cir. 2007). An invasion of privacy in violation of the California Constitution and

18   under California common law is subject to the default personal injury limitation. See Cain v.

19   State Farm Mut. Auto. Ins. Co., 62 Cal. App. 3d 310, 313 (Cal. App. 1st Dist. 1976) (applying

20   then Cal. Code Civ. Proc. §340(3)); Johnson v. Harcourt, Brace, Jovanovich, Inc., 43 Cal. App.

21   3d 880, 896 (Cal. App. 2d Dist. 1974) (applying then Cal. Code Civ. Proc. §340(3)). A general

22   negligence cause of action is subject to Cal. Code Civ. Proc. § 335.1. Das v. WMC Mortg. Corp.,

23   2010 U.S. Dist. LEXIS 122042, *20 (N.D. Cal. Oct. 28, 2010). Both intentional and negligent

24   infliction of emotional distress are subject to Cal. Code Civ. Proc. § 335.1. Takahashi v. Merced

25   County Dep't of Educ., 2010 U.S. Dist. LEXIS 16, *10 (E.D. Cal. Jan. 4, 2010), citations

26   omitted.

27        What statute of limitations applies to claims under the Confidentiality of Medical

28   Information Act is not altogether clear. No cases appear to have discussed the subject. In spirit,

18

1   the claim is a violation of privacy, which would bring it under Cal. Code Civ. Proc. § 335.1. See

2   Hensler v. City of Glendale, 8 Cal. 4th 1, 22-23 (Cal. 1994) ("To determine the statute of

3   limitations which applies to a cause of action it is necessary to identify the nature of the cause of

4   action, i.e., the 'gravamen' of the cause of action. The nature of the right sued upon and not the

5   form of action nor the relief demanded determines the applicability of the statute of limitations

6   under our code"), citations omitted.  Breseman suggests an alternate potential statute of

7   limitation: "In an action for injury or death against a health care provider based upon such

8   person's alleged professional negligence, the time for the commencement of action shall be three

9   years after the date of injury or one year after the plaintiff discovers, or through the use of

10  reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall

11  the time for commencement of legal action exceed three years unless tolled for any of the

12  following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign

13  body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured

14  person." Cal. Code Civ. Proc. §340.5.  This statute requires a plaintiff to sue within one year after

15  he/she discovers the injury, a shorter time period than that offered by Cal. Code Civ. Proc.

16  §335.1.

17       This suit was filed on January 24, 2008.  Doe filed a CTCA notice with Kaweah Delta on

18  October 10, 2007. See Doc. 84, Exhibit B. Doe argues that the time between October 10 and

19  January 24 should be equitably tolled as "Plaintiff provided notice to KAWEAH of his

20  impending claims in the Tort Claim he filed on or about, October 10, 2007." Doc. 84, Doe

21  Opposition, at 4:25-26.  Equitable tolling suspends the running of a statute of limitations when a

22  plaintiff seeks alternative legal relief against the defendant as long as there is "(1) timely notice

23  to the defendant in filing the first claim; (2) lack of prejudice to defendant in gathering evidence

24  to defend against the second claim; and, (3) good faith and reasonable conduct by the plaintiff in

25  filing the second claim." Collier v. City of Pasadena, 142 Cal. App. 3d 917, 924 (Cal. App. 2d

26  Dist. 1983), citing Addison v. State of California, 21 Cal.3d 313, 319 (Cal. 1978).  "[T]he

27  running of the limitations period is tolled '[w]hen an injured person has several legal remedies

28  and, reasonably and in good faith, pursues one.' Elkins v. Derby, 12 Cal. 3d 410, 414 (Cal.

1    1974), quoting <u>Myers v. County of Orange</u>, 6 Cal.App.3d 626, 634 (Cal. 1970).  The court need

2    not determine whether equitable tolling applies to the claims against Breseman, Kaweah Delta, or

3    both, as the evidence definitively shows that in 2004, Doe knew of Breseman's revelations.  As

4    the thrust of all Doe's claims is disclosure of private information, this constitutes accrual.

5    Consequently, the limitations period ran out some time in 2006, before Doe filed the CTCA

6    notice.

7         Doe's claims against both Kaweah Delta and Breseman are barred by the statute of

8    limitations.

9

10   **B. Discovery and Sanctions**

11        Doe seeks to reopen discovery "so I can do a proper motion to compel and a motion to

12   determine sufficiency of answers or objections to Request for Admissions."  Doc. 83, Doe,

13   Declaration, at 2:1.  As all of his claims are definitively time barred, further discovery concerning

14   the substance of the case would not be fruitful.

15        Doe also seeks sanctions against Mr. Nelson, alleging he "unethically discuss[ed] the case

16   with Attorney James Holland on two occasions, July 7, 2010 and July 13, 2010, when he asked

17   Mr. Holland why he would want to take my case when discovery was closed."  Doc. 82, Doe

18   Declaration, at 1:22-24.  Mr. Nelson has stated, "It is true that I spoke with Mr. Holland. It is also

19   true that I informed him that discovery in this case had been closed for many months, and that the

20   court had reaffirmed the closure of discovery. While Mr. DOE may not be happy that I spoke

21   with Mr. Holland, my communications with Mr. Holland were neither unprofessional nor

22   inappropriate. Consequently, there is no basis for his request for sanctions."  Doc. 85, Nelson

23   Declaration, at 4:1-7.  Mr. Nelson's actions do not appear to violate any court or bar association

24   rule; no sanctions can issue.  Nevertheless, the court does not condone Mr. Nelson's actions in

25   contacting Mr. Holland.  The court notes that it appears that Mr. Nelson discovered the identity

26   of the attorney Doe was communicating with at the July 7, 2010 hearing itself, during which the

27   court stated for the record that Doe had a letter from Mr. Holland.

28

**V. Order**

Defendants Kaweah Delta's and Breseman's motions for summary judgment based on the running of the statute of limitations are GRANTED.  Plaintiff Doe's requests for additional discovery and sanctions against Mr. Nelson are DENIED.


IT IS SO ORDERED.

Dated:    December 22, 2010

_____

CHIEF UNITED STATES DISTRICT JUDGE